## ELBERT v. CRESWELL STREET PHARMACY, Inc. *
### No. 5018.

Court of Appeal of Louisiana. Second Circuit.

May 2, 1935.

E. W. & P. N. Browne, of Shreveport, for appellant.

Harry V. Booth, of Shreveport, for appellee.

DREW, Judge.

Oscar L. Elbert, father of Jack Elbert, instituted this suit individually and on behalf of his minor son for damages resulting from an accident which he alleged occurred on or about March 20, 1934, when his son, riding on a motorcycle with one Sam Sutton, sustained injuries when the motorcycle and an automobile, driven by Mrs. A. E. Herrin, collided at the corner of Olive street where it intersects Magnolia street, in the city of Shreveport, Caddo parish, La. He alleged that prior to March 20, 1934, it had been customary for his son and other boys living in the neighborhood of the Creswell

*Rehearing denied June 4, 1935.

Street Pharmacy, defendant herein, to assist one Sam Sutton, the delivery boy of defendant, in the delivery of parcels, goods, and merchandise sold to the customers; that the officers and agents of said defendant company had knowledge of this fact, and had impliedly acquiesced and consented to such acts on the part of its agent, Sam Sutton; that on the 20th day of March, 1934, Sam Sutton had requested his son to assist in the delivery of merchandise to defendant's customers, and while in the course thereof, Sam Sutton, driving the motorcycle, collided with an automobile driven by Mrs. A. E. Herrin, at the intersection of said streets, due solely to the negligence of said Sutton (1) in failing to keep a proper lookout; (2) in failing to allow to the automobile driven by Mrs. Herrin the right of way, she having entered the intersection ahead of and in front of the motorcycle driven by Sutton; and (3) the failure of Sutton to drive his motorcycle on the right-hand side of the street, which would have averted the accident.

Plaintiff computed his damages as follows: Injuries to the right arm, elbow, and left ankle, $750; pain and suffering, $1,500; for the retarding of his son in his school work, $500; and individually for himself, for medical fees paid, $100.

Defendant's answer, after denying specifically all the allegations of plaintiff's petition, entered the special defenses as follows: (a) That the motorcycle referred to in plaintiff's petition was not owned by defendant company, and that the said Sutton had no authority whatever to call on other parties to assist him in making deliveries. To the contrary, he had been instructed not to permit any one to ride on said motorcycle while making deliveries. (b) In the alternative, that plaintiff's son contributed to the causes leading to the accident declared upon, by failing to have remonstrated with Sutton or protesting against any negligence or carelessness on the part of said Sutton; and (c) further, in the alternative, that plaintiff's son assumed whatever risk was incident to riding on said motorcycle, and, if he was riding on the rear thereof at the time of said collision, his act constituted negligence per se.

On the above issues the case was tried below resulting in judgment for plaintiff in the sum of $100 individually, for medical fees and services, and $500 for the use and benefit of the minor, Jack Elbert.

From this judgment, defendant has perfected an appeal.

Appellant's counsel concedes the negligence of Sutton, defendant's motorcycle driver. We will therefore pretermit any discussion of that issue, other than to say that the record clearly bears out the contention of plaintiff on this point.

Defendant had in its employ one Sam Sutton, whose duties were to deliver goods, parcels, and merchandise sold by defendant. In making said deliveries, Sutton used a motorcycle which belonged to him. The employment covered the use of the motorcycle by Sutton, for the benefit of defendant. At the time of the accident, Sutton had been in defendant's employ as delivery man for about five months, and during that time had constantly invited and allowed other boys to ride with him on the motorcycle and assist him in making the deliveries. He testified he did this "for whatever assistance they might render and partly for company." He further stated that he carried some of the boys behind him almost every day while he was working for defendant. He also testified that he had been instructed by Mr. Moore, president and manager of defendant company, not to carry any boys with him on the motorcycle. However, he continued to do so, and daily left the front of the store with the boys behind him, after having been instructed not to carry them. Mr. Moore testified that he instructed Sutton not to take any one with him when making deliveries. He further testified as follows: "Most emphatically, because we didn't want anything like this to happen, and I warned that boy any number of times, two or three times a day sometimes, about taking people."

When asked if, when he knew his instructions were being violated, why he did not discharge the boy, he said he just did not want to. Mr. Moore later testified that he did not ever see any one on the motorcycle with Sutton, and was pressed by the court for an answer to questions he had evaded answering, as follows:

"By the Court: I am not talking about this particular occasion. What I am talking about is with reference to what happened prior to that time, because I understood you to state to Mr. Booth that you had frequently instructed Sutton, and unless he had violated those instructions, there would not have been any occasion for repeated instructions. Therefore, you did know that, notwithstanding those instructions, he was going ahead and repeatedly doing it?"

His answer was, "Uh huh."

Later on, Mr. Moore testified the reason he had not discharged Sutton for disobeying instructions was because boys with motorcycles were hard to get. After the accident he did not discharge Sutton, and Sutton continued to work for three months, when he quit of his own accord.

■ Sutton had been delivering for defendant for a period of five months. His motorcycle, when not in use, was parked at the side of the store. When he had deliveries to make, he would bring it to the front of the store, get his packages, mount his machine, a boy would get on behind him, take part of the packages, and they would then leave to make the deliveries. This continued almost daily, and sometimes several times a day, for the entire period of five months. Mr. Moore, president and manager of defendant company, was in the store, both front and back, and no doubt in and out the store, and it is unreasonable to believe he did not see and know what was going on in front. These daily acts of Sutton, without the admission made by Mr. Moore when pressed for an answer by the Judge, were sufficient to bring knowledge to him that his instructions were being violated daily.

■ There is another feature which weakens the position taken by Mr. Moore, and that is that he at no time ever made any boy get off from behind Sutton when starting out on a delivery, and, as we have stated, it is unreasonable to think he did not see them at some time. The mere fact that he instructed Sutton not to carry any one with him was not sufficient. He knew his instructions were being violated, and took no action of any kind to see that they were being complied with.

The last testimony of Mr. Moore, that he did not discharge Sutton because it was difficult to secure a boy with a motorcycle, is another admission of his knowledge that Sutton was carrying boys with him when making deliveries, and in order to have Sutton's services, he was willing for this practice to continue.

■ The above-related facts and the other evidence in the record clearly and unequivocally show that Mr. Moore, defendant's president and manager, acquiesced in and ratified acts of his agent, Sutton, in using other boys to help him make deliveries, and that Sutton, under the circumstances of this case, had apparent authority to take Jack Elbert with him on the motorcycle to make deliveries, and that acquiescence and ratification applies to the time Jack Elbert was assisting Sutton and riding with him on March 20, 1934, at which time the accident occurred and Jack Elbert received his injuries, due solely to the negligence of Sutton, defendant's agent. Sutton invited Jack Elbert to ride with him on this occasion, and at the time of the accident Elbert was helping him with merchandise that was to be delivered. He was clearly an invitee of defendant, by virtue of defendant's acquiescence in and ratification of the acts of Sutton over a long period of time. Therefore, being an invitee of defendant, it is liable for any damage caused to him through the negligence of its agent, Sutton, unless the invitee was guilty of contributory negligence which was a proximate cause of the accident. It is very doubtful if there was time for Elbert to give warning to Sutton of the danger ahead after the danger arose. However, he swears he gave warning and Sutton swears he does not remember. Furthermore, Elbert was directly behind Sutton on the machine and did not have the same opportunity to see the danger as did Sutton.

■ One pleading contributory negligence must prove it, and defendant has failed in this respect.

The other defense set out in the pleadings is not urged here.

■ Jack Elbert sustained a fracture of the inner condyle of his right arm, near the elbow. He had abrasions over his entire body. One ankle was slightly injured, his hand was bleeding, and his back gave him a great deal of trouble for a week. He had to carry his arm in a sling for three weeks, and the condition of his arm prevented him from writing, thereby forcing him to drop two of his subjects in high school, due to the fact that he could not write, which retarded his advancement in his classes for half of a term. He was fifteen years old, and in the eighth grade. He suffered a great deal, especially with his back. He had completely recovered at the time of trial below.

The lower court awarded judgment for doctor's and medical bills, $100, and $500 for the use and benefit of Jack Elbert. We are asked to increase the amount by answer to appeal.

In Elliot v. Rhymes (La. App.) 153 So. 600, for a schoolboy's fractured collar bone, he having lost no time from school, we allowed $625, plus the doctor's bills, and we are of the opinion that the award in this case should be increased from $500, for the use and benefit of Jack Elbert, to the sum of $750, and the judgment in all other respects affirmed.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be amended by increasing the award for the use and benefit of Jack Elbert from $500 to $750, and, as so amended, that the judgment be affirmed.